**Candice MILES, Appellant**

v.

**HOWARD UNIVERSITY, Appellee.**

**No. 15-7027**
**September Term, 2015**

United States Court of Appeals,
District of Columbia Circuit.

Filed On: June 14, 2016

4

Robert Scott Oswald, Nicholas Woodfield, Employment Law Group, PLLC, Washington, DC, for Plaintiff–Appellant.

Daniel I. Prywes, Bryan Cave LLP, Washington, DC, for Defendant–Appellee.

Before: Millett and Wilkins, Circuit Judges, and Randolph, Senior Circuit Judge.

## JUDGMENT

Per Curiam

This appeal was considered on the record from the United States District Court for the District of Columbia and on the briefs and arguments of the parties. The Court has accorded the issues full consideration and has determined that they do not warrant a published opinion. *See* D.C. Cir. 36(d). For the reasons stated below, it is

**ORDERED and ADJUDGED** that the judgment of the district court be affirmed.

Through grants from the U.S. Small Business Administration, Howard University runs the District of Columbia Small Business Development Center Network. That Network provides small-business development and counseling services to D.C. residents. Those services are delivered through non-profit organizations that subcontract with Howard University to operate grant-funded "service centers" across the District. Under those subcontracts, each service center must meet annual performance benchmarks for client recruitment, client counseling, and business development. Howard University also operates the "Lead Center" as the Network's hub.

At the time this dispute arose, the University of the District of Columbia (UDC) operated one of those service centers. Candice Miles became that center's director in 2009, notwithstanding "reservations" about her appointment because she had no prior experience managing staff, developing marketing plans, preparing budgets, or making the type of financial filings required by the Howard University-UDC subcontract. J.A. 711.

As it turns out, the UDC Center floundered under Miles' leadership. In 2009, the Center achieved only 29% of its client-acquisition goal and only 5% of its client-counseling goal. By 2010, the UDC Center lagged significantly behind the other centers in the Network. In early 2011, the Executive Director of the Lead Center identified the UDC Center as the "worst-performing Center in the [N]etwork." J.A. 715. Miles was well aware of her center's poor performance and the need for significant improvement. But she consistently failed to take corrective actions, and left unfilled the critical position of a full-time business counselor who could have assisted with client counseling and operating the Center.

Meanwhile, in December 2010, an accreditation team from the Association of Small Business Development Centers inspected several of the Network's service centers, including the UDC Center. The team concluded that substantial improvements were required to maintain accreditation, and that the UDC Center's performance was "especially problematic." *See* J.A. 715. In its February 2011 draft report, the team recommended that the Network's accreditation be deferred, and that Howard "revisit and analyze its organizational structure" before attempting to regain accreditation. *Id.* at 716. The next month, the team repeated that Howard University needed "to seriously restructure the Network," and in doing so should "take a hard look" at the UDC Center. *Id.* Shortly thereafter, the team formally deferred the Network's accreditation, prompting an official warning to Howard University that its

grant was in "serious jeopardy." *See id.* at 717–718.

In August 2010, Miles learned that she was pregnant, with an expected due date in early April 2011. She informed UDC in the Fall of 2010, but did not notify anyone at the Lead Center about her pregnancy or forthcoming extended absence until January 2011. Complications with her pregnancy put Miles on bed rest on March 7, 2011. A week later, Miles emailed the Lead Center Executive Director advising that she had started her maternity leave and would not return for three or four months. Absent from that e-mail was any discussion of how the UDC Center would continue to function in her absence. Miles has acknowledged her obligation as Center Director to ensure the continuity of operations during her leave. But she never "informed [Howard University] of any plan for servicing UDC's clients" in her absence, or made any effort to arrange for temporary personnel to provide counseling services at the UDC Center. J.A. 718, 719. According to the record, Miles' only plan was to re-direct clients to another service center, although she acknowledged that she had no idea whether that center had the staffing or resources "to provide counseling to all of UDC's clients." *Id.* at 719.

Upon learning that the UDC Center would be effectively shuttered until Miles returned, the Lead Center's Executive Director warned UDC about the accreditation team's calls for immediate corrective action, the UDC Center's prolonged underperformance, and the complete breakdown in services wrought by Miles' failure to plan for her absence. He directed UDC to create a recovery plan for the Center's operations in Miles' absence and for an overall improvement in performance. In an April 7, 2011 letter memorializing that directive, the Executive Director placed the UDC Center on probation and advised that its subcontract could be terminated if its recovery plan was not satisfactory. The letter added that the "Service Center Director is currently on maternity leave," and that she took that leave "without prior notification to the Executive Director" and without making "any meaningful provision for the continuation of client services[.]" J.A. 867. The letter further noted that Miles had not advised the Executive Director of her expected return date, and had "essentially abandoned the service center and its clients by her failure to take the necessary and proper steps to assure viable operation of the service center." *Id.* The letter worried that, "[u]nder its present condition," the Center was unlikely to be operational again until after Miles returned. *Id.* Given all of that, the letter suggested that UDC consider "replacing [Miles] with a more experienced person, who has an educational background and meaningful experience in marketing, business development, consulting, and communications." *Id.* at 868.

When UDC's response came up short, the Executive Director again complained to UDC that: (i) the UDC Center "has been and continues to be non-functioning and non-performing since Ms. Miles took leave in mid March, 2011"; (ii) there had been no "measurable change in the function of the Center," and "no significant change proposed for the foreseeable future"; (iii) UDC's "lack of effective oversight" had led to the lack of any "plan for operating the center while Ms. Miles is on leave"; and (iv) UDC's failure to make necessary personnel changes meant that "the Center's leadership, which for nearly two years has proven seriously inadequate will remain the same." J.A. 876. The Executive Director informed UDC that its subcontract would be terminated unless it promptly complied with several "non-negotiable conditions," including replacing Miles with "appropriate new leadership"

within 60 days, and submitting a "proper recovery and marketing plan" once a new Director began working. *Id.* at 877. UDC refused to comply. Howard University then formally terminated UDC's subcontract. Because Miles' salary was paid from funds provided under the subcontract, UDC terminated her employment shortly thereafter.

As relevant here, Miles filed suit against Howard University, alleging that her termination violated the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, a similar provision of D.C. law, D.C. CODE § 32-501 *et seq.*, the D.C. Human Rights Act, D.C. CODE § 2-1401.01 *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The district court granted summary judgment for Howard University. *Miles v. Howard Univ.*, 83 F.Supp.3d 105 (D.D.C. 2015). The court held that Howard University was not liable both because it was not Miles' "joint employer," and alternatively because Miles failed to show that Howard University's stated performance-based reason for terminating the UDC subcontract was pretextual.

Reviewing *de novo*, we affirm. *See Coleman v. District of Columbia*, 794 F.3d 49, 57 (D.C. Cir. 2015). Miles proceeded under a single-motive retaliation theory, contending that she was fired solely because she exercised her FMLA rights. *See* Oral Arg. Tr. at 5 (Feb. 11, 2016). Accordingly, the central question at summary judgment is whether Miles " 'produced sufficient evidence for a reasonable jury to find that [Howard University's] asserted * * * reason' " for terminating the UDC subcontract that led to her termination was not the true reason, and that Howard University intentionally discriminated or retaliated against her. *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015) (quoting *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)).

Howard University produced evidence that it terminated the subcontract because the UDC Center was the "worst-performing Center in the [N]etwork," and had no foreseeable prospect of improving. J.A. 715. The record amply evidences that the Center was persistently underperforming under Miles' leadership. Also, it is undisputed that the Network "later regained full * * * accreditation" after the UDC Center was closed, and that the Small Business Administration subsequently concluded during a review of the Small Business Network "that Howard's termination of the UDC subcontract was managerially and strategically sound." *Id.* at 721 (internal quotation marks omitted). Those undisputed facts, combined with UDC's undisputed failure to rectify any of the deficiencies identified as in need of urgent correction, substantiate Howard University's non-pretextual and non-discriminatory explanation for its action.

That showing shifted the burden to Miles to produce evidence from which a reasonable jury could conclude that Howard University's proffered reason for terminating the UDC subcontract was pretextual, and that its actual motive was her FMLA leave. *See Brady*, 520 F.3d at 496 n. 4; *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1367–1368 (D.C. Cir. 2000). We hold that Miles failed to make any plausible showing that Howard University chose to close an entire service center just because she took parental leave.

█ *First*, Miles argues that the April 7, 2011 letter's reference to her maternity leave "singled out" her FMLA leave as the precipitating factor for the UDC Center's suspension. Miles Br. 31. The letter is clear, however, that Howard University's Lead Center was not complaining that

Miles had taken leave, but that she had done so without: (i) informing the Lead Center of her plans, (ii) making viable arrangements for the continuity of client service, and (iii) filling a crucial staff vacancy before departing—thus effectively shuttering the UDC Center at the exact time that Howard University was being asked to justify its continued operation and receipt of taxpayer funds. J.A. 867. No reasonable jury could find from that evidence that the termination rested solely on her use of FMLA leave.

Miles argues that she redirected UDC's current and prospective clients to another center. Oral Arg. Tr. 16–17 (Feb. 11, 2016); J.A. 851. Maybe. But that just underscores that she made no plan for the continuity of operations *at the UDC Center*. Miles also lacked any record evidence that the Network's operational practice permitted a center director to unilaterally transfer *all* of her present and prospective clients to other centers for an indefinite period of time.

■ *Second*, Miles argues (Br. 31) that Howard University terminated the subcontract because UDC refused to replace her while she was on leave. But the record shows that the contract was terminated because UDC failed to provide an adequate recovery plan and wholly refused to implement the prescribed last-chance, "non-negotiable conditions" for keeping the Center open. J.A. 877. To be sure, one of those conditions was hiring "appropriate new leadership for the Center[.]" *Id.* But Miles produced no credible evidence suggesting that the call for new leadership was motivated by a discriminatory or retaliatory animus based on her taking FMLA leave.

*Third*, Miles argues that the Network's overall decline undermines Howard University's performance-based reasons for terminating UDC's subcontract. But whatever the condition of the Network as a whole, the undisputed record evidence shows that the UDC Center was the "worst-performing Center in the [N]etwork" and had no plan for improvement. J.A. 715. Indeed, it is undisputed that both Howard University and UDC had explicitly identified the UDC Center as woefully underperforming—even relative to the other centers—long before Miles informed anyone that she was planning to take parental leave. *See id.* at 714–715. The record further shows that concerns about the Center's performance were brought to Miles' attention, but still no corrective actions were taken on her watch. *Id.* at 272, 579–584. In addition, the UDC Center's poor performance left Howard University at risk of losing funding for the entire Network. The undisputed record shows, moreover, that calls for a "hard look" at the UDC Center originated not with Howard University, but with the accreditation team, at a time when no one knew that Miles was on parental leave. *Id.* at 716.

■ *Fourth*, Miles argues that Howard University demonstrated discriminatory animus by expecting a continuity of service plan when it did not require a similar plan from the D.C. Chamber Center after its director resigned. Miles Br. 34–35. That argument overlooks the undisputed evidence that the Chamber Center kept functioning because its director had hired a business counselor, who was able to step in and keep that center running. J.A. 718. Miles failed over the course of nearly a year to fill the business counselor vacancy at the UDC Center. Miles also admitted, *see id.* that the Chamber Center was *not* "equally non-functioning" because it performed considerably better than the UDC Center in meeting contractual benchmarks. *See id.* at 342, 345.

*Fifth,* Miles points to an exchange in which a UDC Dean allegedly said that terminating Miles during her leave would be "illegal," and the Dean of Howard University's business school replied that "may be right." J.A. 883. Even viewed in the light most favorable to Miles, the Howard University Dean's "may be" response to the UDC Dean's lay legal opinion does not by itself create a disputed question of material fact concerning pretext given the mountain of undisputed record evidence corroborating Howard University's performance-based decision to terminate the subcontract. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

*Finally,* Miles argues that the temporal proximity between the Executive Director learning about her leave and termination of the subcontract support a reasonable inference of retaliatory intent. That is incorrect. Temporal proximity, standing alone, cannot rebut an employer's legitimate, non-discriminatory reason for an adverse employment action. *See Gleklen,* 199 F.3d at 1368–1369.

In sum, we affirm the grant of summary judgment because Miles has failed to produce sufficient evidence to rebut Howard University's legitimate, non-discriminatory justification for terminating the UDC subcontract. That determination equally disposes of Miles' claims under Title VII and District law. *See Gleklen,* 199 F.3d at 1367 (applying *McDonnell Douglas* burden-shifting analysis to claims under Title VII and the D.C. Human Rights Act); *Alford v. Providence Hosp.,* 945 F.Supp.2d 98, 108 (D.D.C. 2013), *aff'd,* 561 Fed.Appx. 13 (D.C. Cir. 2014) ("The *McDonnell Douglas*

framework applies to retaliation claims" under the "FMLA/DCFMLA"). We accordingly need not reach the district court's alternative holding that Howard University did not qualify as Miles' joint employer.

Pursuant to D.C. Circuit Rule 36, this disposition will not be published. The Clerk is directed to withhold issuance of the mandate herein until seven Days After the Resolution of Any Timely Petition for Rehearing or Rehearing En Banc. *See* FED. R. APP. P. 41(b); D.C. CIR. R. 41(a).